UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JAMAL PETTY,                                     :

                  Petitioner,          :

                                    REPORT AND
     -v.-                                      :    RECOMMENDATION
                                    07 Civ. 6090 (WHP) (GWG)

WILLIAM J. CONNOLLY, Superintendent,             :
Fishkill Correctional Facility,

                                :

                  Respondent.
------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Jamal Petty has brought this petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.  On December 9, 1992, he was convicted by a jury of Manslaughter in the First Degree,

N.Y. Penal Law § 125.20[1], and Criminal Possession of a Weapon in the Second and Third

Degrees, N.Y. Penal Law §§ 265.03, 265.02[4], in connection with the shooting death of Derrick

Torrence on the evening of July 2, 1990.  Petty was sentenced to a prison term of 8-1/3 to 25

years and has since been released to parole supervision.  For the reasons set forth below, the writ

should be denied.

I.      BACKGROUND

     A.    Trial

      On November 10, 1992, Petty's trial commenced in the New York Supreme Court for

Bronx County before Judge Steven Lloyd Barrett.  (See Tr. 2).[1]  Petty admitted that he shot

Torrence but contended that he did so in self-defense.

---

     [1]  "Tr." refers to the transcript of the trial held in People v. Petty, No. 9881-90, between
November 10, 1992 and December 10, 1992.  See State Court Transcripts (Vol. I of IV), filed
Nov. 5, 2009 (Docket # 15); State Court Transcripts (Vol. II of IV), filed Nov. 5, 2009 (Docket
# 12); State Court Transcripts (Vol. III of IV), filed Nov. 5, 2009 (Docket # 13); State Court
Transcripts (Vol. IV of IV), filed Nov. 5, 2009 (Docket # 14).

I.    People's Case

Ebony Boone and Ta-Tanisha Dean were eye-witnesses to the shooting.  Each was a friend of both Petty and Torrence.  (Boone: Tr. 81-82; Dean: Tr. 196-97).

Boone testified that at approximately 11:30 p.m. on the night of July 2, 1990, she was outside speaking with Torrence in an area between Willis and Alexander Avenues in the Bronx.  (Boone: Tr. 83).  She did not observe a gun or a knife on Torrence during their conversation and testified that he was not wearing a coat over his clothing.  (See Boone: Tr. 84-85).  As she road away on her bike, she saw Petty approaching the area.  (See Boone: Tr. 86-87).  Boone testified that she saw Torrence look at Petty and that Torrence "went to run," or was "getting ready to run," after which Petty shot him twice.  (Boone: Tr. 87, 98, 119, 183).  Boone elaborated that she saw Petty "pull[] out" a gun (Boone: Tr. 161, 162) and then Torrence "went to run and he took like one or two steps . . . ."  (Boone: Tr. 161).  At that point, Petty shot one time, missed, and then shot Torrence again.  (Boone: Tr. 161).  Torrence's back was facing Petty at the time of the shooting.  (Boone: Tr. 87, 182).  Boone conceded that she did not know whether Torrence reached into his waistband at the time of the shooting because she was not actually looking at Torrence at that moment, but rather was looking at Petty.  (Boone: Tr. 165, 184, 188).

Dean was standing approximately 30 feet away from Torrence and Petty at the time of the shooting.  (Dean: Tr. 227-28, 233-36, 295).  Torrence was standing approximately five feet from Petty, and Dean observed Torrence turn his head away from Petty when he was shot.  (See Dean: Tr. 256, 294-95).  Dean explained that Torrence's back was to Petty at the time of the shooting, that he "turned [to] look at" Petty "and then [Torrence] turned back around" before he was shot.  (Dean: Tr. 204).  She saw Torrence's hands, but did not see him reach for anything.

2

(Dean: Tr. 205). She acknowledged, during cross-examination, that she was unable to see what Torrence had done with his right hand prior to the shooting, and that she did not know if he had reached into his waistband before he was shot. (See Dean: Tr. 253).

Police Officer James Cahill testified that upon arriving at the scene there was a crowd of people standing around the victim and that he did not find a weapon near Torrence. (See Cahill: Tr. 299-304). Torrence was left a paraplegic as a result of the shooting and died four months later.

Dr. Laurence Kennedy testified that he treated Torrence for injuries sustained from a "gunshot wound to the right posterior neck." (Kennedy: Tr. 468). Dr. Gerald Feigin, a forensic pathologist, testified that his autopsy showed Torrence was not facing his shooter when he was shot because "the back of the neck face[d] the gun barrel." (Feigin: Tr. 556, 584-85).

      ii.    Defense's Case

The defense offered evidence that on June 21, 1990, Torrence had attacked and threatened Petty following a dispute over a dice game. The defense called Jakeam Davis, Darrell Montgomery, Darren Pressley, as well as Petty to testify to these threats. The testimony was that on the evening of June 21, 1990, Petty and Torrence were among a group playing a game of dice. (See Montgomery: Tr. 626-27). Petty won the game, but Torrence refused to pay, prompting a fight between the two. (See Montgomery: Tr. 628-29). Torrence started threatening Petty shouting: "you are going to die," "I'm going to kill your ass now." (Montgomery: Tr. 632; Pressley: Tr. 737-38). Although Petty attempted to calm the situation, Torrence grew increasingly hostile and continued to threaten Petty. (See Pressley: Tr. 737-38). The situation culminated in Torrence reaching for a gun held by another member of the group, which prompted Petty to flee the scene. (See Montgomery: Tr. 641; Pressley: Tr. 742-45).

3

Eventually, Petty returned to the area after Torrence relinquished the gun to a friend, but Torrence continued to threaten Petty.  (See Pressley: Tr. 745-47).

The next day, June 22, 1990, Petty and Torrence had a second encounter during which Torrence continued to verbally threaten Petty stating "I'm going to kill your ass."  (Pressley: Tr. 754-55).  The encounter became physical when Torrence and his friends "tried to jump on" Petty.  (Pressley: Tr. 754-55).  The situation escalated to the point where Larry Clark, a friend of Torrence, shot Pressley who was also at the scene.  (See Montgomery: Tr. 673; Pressley: Tr. 756-57).  During the shooting, Montgomery heard Torrence yell "[y]o, shoot Jamal." (Montgomery: Tr. 673).  Pressley also testified that although Clark was prosecuted for shooting him, he believed Torrence was also responsible for the shooting and that he had heard Torrence order Clark to shoot Petty.  (See Pressley: Tr. 756, 786).  Pressley admitted that he did not inform the police that at the time of the shooting Torrence was threatening Petty, because "snitching" was frowned upon.  (Pressley: Tr. 766-67).

The trial judge would not permit Pressley to testify about a conversation between him and Gail Scott, a former girlfriend of Clark's, in which she stated that Torrence continued to make threats against Petty after June 21.  (See Tr. 760-66).  As part of his argument in seeking to have the statement admitted, defense counsel contended that the statement was relevant to the defense's contention that Torrence was the "initial aggressor" on the night he was shot (see Tr. 761), which would have constituted a defense to the manslaughter charge under New York Penal Law § 35.15.  The trial court ruled, however, that "as a matter of law you cannot attribute the status of initial aggressor to the events of [June 21 and June 22]."  (Tr. 762).

Petty testified in his own defense.  (See Petty: Tr. 1170-1362).  In addition to describing his encounters with Torrence on June 21 and 22, Petty testified that Scott told him that she

overheard Torrence say to Clark that he planned to kill Petty: specifically, that Torrence said that "it will be war[] next time he'll see me [and that Petty] wouldn't get a chance to walk away." (Petty: Tr. 1199).  The trial judge admitted Petty's testimony about Scott's statement for the limited "purpose of showing that such a statement was made."  (Tr. 1198).

On the evening of July 2, 1990, Petty testified that upon leaving his friend Ronald's home to visit his daughter, Pressley's brother gave him an unregistered gun.  (Petty: Tr. 1201, 1226).  On the way to his destination, he encountered Torrence.  (See Petty: Tr. 1204).  He testified as follows regarding their encounter:

> [Torrence] wasn't moving and he had his hands at his side so when I seen him I took another step or two because I couldn't believe it was him and I had my hands at my side and when I seen him I froze and I looked at him and he turned his body this way, (indicating) his feet were pointing towards the path but his body was this way (indicating).  No words where exchanged or anything like that and he just reached and when he reached I said, owe [sic] my God, I am going to die this man is gonna kill me and I looked at my waist and I pulled my weapon up and I fired twice at Derrick and he fell face first.

(Petty: Tr. 1205).  Petty explained that Torrence was staring at him up until the time that Petty reached for his gun, and that before he fired he saw Torrence reach for something and he "just reacted."  (Petty: Tr. 1206-07).  Petty testified that his "first instinct was to run, but when [he saw Torrence] reach [he] thought that was it, judgment day was there" (Petty: Tr. 1208) and that "[Torrence was] about to kill [him]."  (Petty: Tr. 1210).  Petty believed Torrence had a gun and was about to kill him, and that he had no chance to escape or hide.  (Petty: Tr. 1209-13, 1285).  Petty fled the scene on July 2, but turned himself in on July 10, 1990, after retaining an attorney to represent him.  (Petty: Tr. 1211-12).

The defense called an expert medical witness, Dr. Mark Taff, who agreed with Dr. Feigin that the relative positions of Torrence and Petty could not be determined from the gunshot

wound.  Nonetheless, he testified that it was "impossible" for Torrence to have been facing Petty at the time he was shot.  (Taff: Tr. 1083-84).

The defense sought to call Scott to testify to a conversation she had with Clark and Torrence on June 28, 1990, but the trial court denied the request.  (See Tr. 917).  In its application to the trial court, defense counsel explained that Scott heard Torrence state that it "was not over between him and [Petty] and that the bullet that had hit Pressley [on June 22] was meant for Petty."  (Tr. 761, 915).  The defense gave several reasons for calling Scott as a witness.  First, counsel argued that it was relevant to show Petty's state of mind on July 2, 1990, and second, that it was relevant to prove that Torrence was the initial aggressor.  (See Tr. 761).  In addition to reaffirming its prior ruling that Scott's testimony was irrelevant to the question of initial aggressor, the trial court precluded the testimony as "excessive and cumulative," reasoning that "at this point I believe that we heard enough as to the incident of June 22nd . . . ." (Tr. 917-18).

Defense counsel sought to call Scott for the additional reason that her testimony would rebut the People's attempt to impeach Pressley's testimony.  (See Tr. 920).  The trial judge found Scott's testimony to be cumulative and not admissible as a prior consistent statement to rehabilitate Pressley's testimony.  (See Tr. 920-21).  Eventually, defense counsel moved for a mistrial because of the exclusion of Scott's testimony.  (See Tr. 1364-65).  The trial court denied the application.  (See Tr. 1365)

### iii.    People's Rebuttal

In the People's rebuttal case, Clark testified to shooting Pressley on June 22, 1990, but denied that Torrence ever instructed him to shoot Petty.  (See Clark: Tr. 1382-83).  Assistant District Attorney Jean Smith and Police Officer Leslie Mirabal testified that Pressley never

6

connected the feud between Petty or Torrence to his shooting during their investigation and prosecution of the case.  (See Mirabal: Tr. 1435; Smith: Tr. 1462).  Following Clark's testimony, the trial court denied defense counsel's application to call Scott as a witness to rebut these statements.  (See Tr. 1502-10).

    iv.    Jury Charge and Deliberation

Defense counsel objected to the court's proposed charge on the initial aggressor element of the justification defense because the charge failed to instruct the jury that prior threats were admissible to show not only the reasonableness of the defendant's belief at the time of the shooting, but also which party was the initial aggressor.  (See Tr. 1589).  Defense counsel relied on the New York Court of Appeals' decision in People v. Miller, 39 N.Y. 2d 348 (1976), in arguing that evidence of prior attacks and threats were admissible on the issue of Petty and Torrence's states of mind at the time of the shooting, and thus whether Torrence was the initial aggressor (See Tr. 1588-95).  The trial court disagreed and gave the following instruction on the issue of justification:

> When a claim is made as it had been here, that a defendant's use of deadly physical force was justified under the law, a jury's first duty is to determine whether the justification defense may be considered as to that defendant or whether the defendant is precluded from raising the defense because he was the initial aggressor in the encounter in which he used deadly force.
>
>  Here the jury must decide, who i[n] the July 2, 1990 encounter between Jamal Petty and Derrick Torrence was the initial aggressor.
>
> This must be done first because the law provides that a person who is the initial aggressor, that is the one who first uses offensive deadly physical force may not avail himself of the defense of justification.  Only the person who uses deadly physical force defensively, that is in his own defense is entitled to claim that he was acting in self-defense.
>
> Generally speaking, a person who takes the offensive when he is

7

not being or about to be attacked and strikes the first blow or inflicts the first wound is the initial aggressor.  However, the striking of the first blow or infliction of the first wound is not automatically determinative.  One who reasonably believes that another is using or is about to use deadly physical force against him and who then strikes the first blow or inflicts the first wound is nonetheless using defensive deadly physical force.

(Tr. 1790-92).

After noting that the defendant could use force defensively against what he "reasonably believed" was the imminent use of offensive force, the judge instructed as follows:

[A]cts or threats if the jury finds that they did in fact occur may be considered by the jury insofar as they bear on what the actor reasonably believed was about to occur and was necessary in response.

However past violent acts or threats do not themselves render deadly physical force defensive, regardless of what a jury believes previously occurred is offensive deadly physical force.  Here, testimony of prior violent acts or threats by Derrick Torrence against Jamal Petty, if credited by you may be relevant as to what Jamal Petty reasonably believed on July 2, 1990.

At the same time the justification to use deadly physical force can be triggered only by an act by Derrick Torrence as perceived by Jamal Petty, then and there on July 2, 1990, to which Jamal Petty's act proports [sic] to be responsive.

To reiterate a responsive use of deadly physical force is defensive, a preemptive use of deadly physical force is offensive.  Which category accurately describes Jamal Petty's acts and thus whether you can conclude whether Jamal Petty was or was not the aggressor will turn on what you find Derrick Torrence did or did not do on July 2, 1990 in the moments before he was shot as well as what you find Jamal Petty did or did not reasonably believe on July 2, 1990 at the moment he fired a shot at Derrick Torrence.

(Tr. 1792-94).

The jury deliberated for three days during which it sent a number of notes seeking clarification of issues raised at trial.  (See Tr. 1837-1960).  Four of the jury notes asked questions

8

about the justification defense.  (See Tr. 1844, 1861-62, 1877, 1940).  In response, the trial judge

eventually repeated his earlier instructions (see Tr. 1891-1914) and thus repeated that

"justification to use deadly physical force can be triggered only by an act of Derrick Torrence as

perceived by Jamal Petty then and there on July 2, 1990." (Tr. 1897).  Defense counsel objected

to the content of the instruction and was overruled.  (See Tr. 1916-18).

On the third day of deliberations, the jury reported that it was deadlocked on the

homicide charges, and the trial judge permitted it to proceed to the weapon charges.  (See Tr.

1921, 1931-39).  Subsequently, the jury sent a note requesting another review of the elements of

manslaughter and justification, and the judge gave a version of his earlier instructions.  (See Tr.

1940-49).

Later that day, the jury returned its verdict acquitting Petty of Murder in the Second

Degree and finding him guilty of Manslaughter in the First Degree and Criminal Possession of a

Weapon in the Second and Third Degrees.  (See Tr. 1960-61).

Petty was sentenced to a prison term of 8-1/3 to 25 years and to lesser concurrent terms.

B.    Direct Appeal

Petty raised two issues on his direct appeal to the First Department.  He argued that the

trial court's decision to exclude Scott's testimony deprived him of his right to call witnesses in

his own defense in violation of his federal and state constitutional rights.  See Brief for the

Defendant-Appellant (annexed as Ex. 1 to Affidavit in Opposition to Petition for Writ of Habeas

Corpus, filed Dec. 18, 2007 (Docket # 7) ("Resp. Aff.")) at 2.  Additionally, he challenged the

trial court's decision to instruct the jury that they could not consider Torrence's prior threats and

acts for purposes of the "initial aggressor" determination.  See id.  The Appellate Division

affirmed Petty's conviction, holding that Scott's testimony was cumulative and that even if it

were not, its preclusion constituted harmless error.  See People v. Petty, 21 A.D.3d 828, 829 (1st

Dep't 2005).  The Appellate Division also held that the trial court's instruction, "when read as a

whole, provided the jury with proper guidance on the 'initial aggressor' issue."  Id.

The Court of Appeals granted leave to appeal and affirmed the conviction.  See People v.

Petty, 7 N.Y.3d 277, 284 (2006).  It found that the trial court acted within its discretion in

excluding Scott's testimony as cumulative, noting that "[b]y the time the defense made its

request . . . four defense witnesses, including the defendant, had already testified that prior to the

shooting, Torrence made numerous threats against the defendant."  Id. at 286-87.  The court also

held that the evidence was properly excluded on rebuttal as "introduction of such contradictory

testimony is not generally permitted."  Id. at 287 (citing People v. Alvino, 71 N.Y.2d 233, 247-

48 (1987)).

In reviewing Petty's second claim, the Court of Appeals ruled that the trial court's

justification instruction was incorrect in light of the state's long-standing precedent that

"evidence of a deceased victim's prior threats against [a] defendant is admissible to prove that

the victim was the initial aggressor."  Petty, 7 N.Y.3d at 285 (citing Stokes v. People, 53 N.Y.

164, 174-75 (1873); Miller, 39 N.Y.2d at 549).  Nevertheless, the Court of Appeals noted that

the proof at trial showed that the "defendant was the initial and only aggressor," given that

Torrence was unarmed, did not threaten or gesture towards Petty, and had turned to run from the

scene.  Id. at 285-86.  Accordingly, the Court of Appeals concluded that "[b]ecause there was

overwhelming evidence disproving the justification defense and no reasonable possibility that

the verdict would have been different had the charge been correctly given, the error in the trial

court's justification charge was harmless."  Id. at 286 (citing People v. Crimmins, 36 N.Y.2d

230, 242 (1975)).

C.    Petition for Writ of Habeas Corpus

On June 28, 2007, Petty filed the instant writ of habeas corpus.  See Petition Under 28

U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, filed June 28, 2007

(Docket # 2).  In it, Petty argues that the writ should be granted on the grounds that (1) the trial

court's erroneous justification instruction deprived him of his right to a fair trial; and (2)

excluding Scott's testimony deprived him of his Sixth Amendment right to present a defense.

See Petitioner's Memorandum of Law in Support of Petition for a Writ of Habeas Corpus, filed

June 28, 2007 (Docket # 3) ("Pet. Br.") at 4.

The Respondent filed a brief in opposition, see Respondent's Memorandum of Law

(annexed to Resp. Aff.), and Petty filed a reply, see Petitioner's Reply Memorandum of Law,

filed Dec. 27, 2007 (Docket # 8).

On July 17, 2009, Petty was released to parole supervision.  On October 1, 2009, the case

was reassigned from Judge Lynch to Judge Pauley.  On October 12, 2009, the case was referred

to the undersigned for a report and recommendation.  On May 5, 2010, the Court ordered further

briefing on two issues: (1) the evidence concerning the relative positions of Petty and Torrence

just prior to and at the time of the shooting; and (2) the evidence concerning the physical stance

of Torrence at the moment of the shooting, including further explanation of how this evidence

squares with the uncontested fact that the bullet entered the back of Torrence's neck.  See Order,

filed May 5, 2010 (Docket # 16).  The Order further requested that both sides note any

inconsistencies in the evidence submitted which related to the two issues above.  See id.  On July

12, 2010, both sides submitted supplemental briefs and exhibits.  See Post-Briefing

Memorandum in Support of Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254,

filed July 12, 2010 (Docket # 17); Supplemental Declaration in Opposition to Petition for a Writ

of Habeas Corpus, filed July 12, 2010 (Docket # 18).

II.     STANDARD OF REVIEW UNDER 28 U.S.C. § 2254

A petition for a writ of habeas corpus may not be granted with respect to any claim that

has been "adjudicated on the merits" in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d).

For a claim to be "adjudicated on the merits" within the meaning of section 2254(d), it

must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the

substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v.

Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (citations omitted). As long as "there is nothing in

its decision to indicate that the claims were decided on anything but substantive grounds," a state

court decision will be considered to be "adjudicated on the merits" even if it fails to mention the

federal claim and cites no relevant federal case law. Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir.

2001); accord Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011) ("When a federal claim has

been presented to a state court and the state court has denied relief, it may be presumed that the

state court adjudicated the claim on the merits in the absence of any indication or state-law

procedural principles to the contrary.") (citation omitted); see also id. at 784 (section 2254(d)

deference applies even "[w]here a state court's decision is unaccompanied by an explanation").

Moreover, a state court's "determination of a factual issue" is "presumed to be correct," and that

presumption may be rebutted only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to" clearly established federal law only "if the state

court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result.  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  Habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Id. at 411.  Rather, the state court's application must have been "objectively unreasonable" – a standard that is met only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent.  Harrington, 131 S. Ct. at 786; accord id. ("even a strong case for relief does not mean the state court's contrary conclusion was unreasonable").  In other words, to demonstrate an "unreasonable" application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 786-87.

The "determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question."  Brisco v. Ercole, 565 F.3d 80, 89 (2d Cir.), cert. denied, 130 S. Ct. 739 (2009).  "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations" inasmuch as the application of a general standard to a specific case "can demand a substantial element of judgment." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004); accord Brisco, 565 F.3d at 90 (court

applying a "fact-dependent standard . . . to the facts of a specific case is . . . entitled to significant 'leeway' when [a habeas court] review[s] its decision for reasonableness") (quoting <u>Yarborough</u>, 541 U.S. at 664).

Only holdings of the Supreme Court are considered for purposes of determining "[c]learly established federal law." <u>Rodriguez v. Miller</u>, 537 F.3d 102, 106 (2d Cir. 2008) (citation omitted). Thus, "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." <u>Id.</u> at 106-07 (citation omitted). Where there is "[n]o holding" from the Supreme Court on the question presented, <u>Carey v. Musladin</u>, 549 U.S. 70, 77 (2006), or where Supreme Court cases "give no clear answer" to the question presented in the petition, <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008) (per curiam), a state court's decision cannot be contrary to or an unreasonable application of clearly established federal law. <u>See</u> <u>Knowles v. Mirzayance</u>, 129 S. Ct. 1411, 1419 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (citations omitted).

III.     <u>DISCUSSION</u>

We now examine the two claims made in this case.

A.     <u>The Improper Jury Instruction Claim</u>

1.     <u>Law Governing Habeas Review of Jury Instructions</u>

"[I]n order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." <u>Davis v. Strack</u>, 270 F.3d 111, 123 (2d Cir. 2001) (quoting <u>Casillas v. Scully</u>,

769 F.2d 60, 63 (2d Cir. 1985)) (internal quotation marks and additional citations omitted).

Thus, "[w]here an error in a jury instruction is alleged, it must be established not merely that the

instruction is undesirable, erroneous, or even universally condemned, but that it violated some

right which was guaranteed to the defendant by the Fourteenth Amendment." Davis v. Strack,

270 F.3d 111, 125 (2d Cir. 2001) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973))

(internal quotation marks omitted).  "[N]ot every ambiguity, inconsistency, or deficiency in a

jury instruction rises to the level of a due process violation.  The question is whether the ailing

instruction so infected the entire trial that the resulting conviction violates due process."

Middleton v. McNeil, 541 U.S. 433, 437 (2004) (citations and internal quotation marks omitted).

The Second Circuit has noted that:

> The fact that "federal habeas corpus relief does not lie for errors of state law,"
> Lewis v. Jeffers, 497 U.S. 764, 780 (1990), does not mean, however, that errors
> under state law cannot result in cognizable violations of a constitutional right to
> due process.  What due process requires will often depend on what state law is.
> States are free to define the elements of, and defenses to, crimes.  See Apprendi v.
> New Jersey, 530 U.S. 466, 484-87 (2000); McMillan v. Pennsylvania, 477 U.S.
> 79, 84-86 (1986).  Once states have promulgated laws to define criminal conduct,
> however, federal due process protects a defendant from conviction unless he is
> shown in a fair proceeding to have violated those laws.

Davis, 270 F.3d at 123.

The Second Circuit has pronounced that courts must undertake a three-step analysis

before granting habeas relief to a petitioner challenging a state court's refusal to give a jury

instruction.  See Jackson v. Edwards, 404 F.3d 612, 621 (2d Cir. 2005).  Under Jackson, courts

are to make the following inquiry where a requested instruction has not been given: "Was [the

petitioner] entitled to [the] charge [under state law]?  Second, if so, did the failure to give one

result in a denial of due process?  Third, if so, did the state court's contrary conclusion constitute

an unreasonable application of clear Supreme Court law?"  Jackson, 404 F.3d at 621 (citing 28

U.S.C. § 2254).  While the claim here involves an error in an instruction actually given, the same three-step analysis should logically apply.  Thus, we view the questions to be answered as the following: Was the charge incorrect under state law?  Second, if so, was the giving of the faulty charge a denial of due process?  Third, did the state court's contrary conclusion constitute an unreasonable application of clear Supreme Court law?

Here, there is no dispute that the charge was incorrect under state law and the Court of Appeals so held.  Accordingly, the next question is whether the denial of the charge constituted a violation of due process.  The nature of this due process right has not been clearly defined, however.  In Cupp, the Supreme Court dealt with an instruction that mandated a presumption that every witness testified truthfully, which the Court analyzed largely on the basis of whether the instruction shifted the burden of proof to the defendant.  414 U.S. at 147-48.  In the course of this discussion, the Court analyzed the ailing instruction in "the context of the overall charge" and rejected the contention that the instruction "so infected the entire trial that the resulting conviction violate[d] due process."  Id. at 146-47.  Similarly, in Blazic v. Henderson, 900 F.2d 534 (2d Cir. 1990), the Second Circuit denied a writ challenging the failure to give a justification instruction because it perceived "no basis to conclude that a jury would have responded differently had the [requested] charge been given."  Id. at 543.  In other words, case law makes clear that a court applying Cupp must consider whether there "would have" been a different result had the jury been properly instructed.  And the Cupp standard itself, of course, must be applied in conjunction with the deferential standard of 28 U.S.C. § 2254(d), thus requiring a finding that the state court's decision unreasonably applied Cupp.

Case law in this Circuit has not made clear, however, whether in addition to Cupp, a habeas court reviewing claims arising from an improper jury instruction should also engage in a

separate harmless error analysis under Brecht v. Abrahamson, 507 U.S. 619 (1993) – the standard that the Supreme Court has held applies on habeas review. See Fry v. Pliler, 551 U.S. 112, 121-22 (2007). The confusion in this area perhaps derives from the fact that application of the standards at issue would seem to yield similar results. Under Cupp, combined with section 2254(d) deference, the availability of habeas relief turns on whether the state court's decision unreasonably concluded that the outcome would not have been different had the jury been properly instructed. Brecht asks a similar question: that is, whether the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637-38 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)); accord Fry, 551 U.S. at 116.

Cases dealing with improperly instructed juries rarely address the question of the relationship between these two standards. In Davis and Harris v. Alexander, 548 F.3d 200 (2d Cir. 2008), the Second Circuit granted the writ on the grounds that the petitioner had shown a due process violation under Cupp, even with the deference due under section 2254(d). But neither of these cases considered Brecht or any other harmless error standard. Jackson briefly mentions the concept of harmless error, though not Brecht, in the course of its discussion of Cupp. 404 F.3d at 625-26. District courts have cited the language of both Cupp and Brecht together in conducting the analysis of claims of an improper jury instruction in a manner suggesting that each case's standard is the same. See, e.g. Nevins v. Giambruno, 596 F. Supp. 2d 728, 739 (W.D.N.Y. 2009); Valtin v. Hollins, 248 F. Supp. 2d 311, 316 (S.D.N.Y. 2003); Ocasio v. Artuz, 2002 WL 1159892, at *8 (E.D.N.Y. May 24, 2002); Silverman v. Edwards, 2002 WL 257820, at *8 (E.D.N.Y. Jan. 28, 2002); Serrata v. Mazzuca, 2002 WL 31641611, at *6 (E.D.N.Y. Nov. 6, 2002). Other district courts have articulated both standards and appear to

17

have applied one or both independently, but without explaining how they relate to one another. See, e.g., Lau v. Goord, 540 F. Supp. 2d 399, 407 (E.D.N.Y. 2008); Mance v. Fischer, 2007 WL 2403163, at *2 (S.D.N.Y. Aug. 22, 2007); Brown v. Donnelly, 371 F. Supp. 2d 332, 341-42 (W.D.N.Y. 2005); Stewart v. Senkowski, 2003 WL 21508320, at *2-3 (E.D.N.Y. June 16, 2003).

The Court is aware of two cases that have considered the relationship between the standards directly.  In Persad v. Conway, 2008 WL 268812 (E.D.N.Y. Jan. 30, 2008), the court suggested in dictum that the standards operate independently.  Id. at *3.  In Mejias v. Allard, 2006 WL 119033 (E.D.N.Y. Jan. 13, 2006), the court first considered whether there was a due process violation under the Cupp standard and, having concluded that there was such a violation, found that the error was harmless.  Id. at *13-*14.

In light of the fact that both Cupp and Brecht are viable doctrines that must be considered where applicable on habeas review, we believe that a court must first consider whether there was a due process violation under Cupp.  If so, a court should then consider whether that due process violation represented an unreasonable application of Supreme Court law as set forth in 28 U.S.C. § 2254(d).  See Harris, 548 F.3d at 206 n.5 (court must apply section 2254(d) to claim of improper jury instruction even where the state court "never explicitly discussed the question whether the conviction violated due process, much less the Supreme Court's Cupp opinion").  Finally, a court should consider whether that error was harmless under Brecht.  See Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (if a federal court "finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless").  As demonstrated below, we may leave for another day whether application of the Brecht standard could ever differ in application from the Cupp/section 2254(d) standard because, for the reasons stated below, we find that the

18

<u>Cupp</u>/section 2254(d) standard does not permit granting of the writ.

>   2.      <u>Whether the Trial Court's Improper Justification Instruction Violated Due Process</u>
>
>        a.      <u>The "Initial Aggressor" Determination Under New York Law</u>

To understand the effect of the incorrect instruction, we begin by considering New York law on justification. In New York, justification is a "defense" rather than an "affirmative defense," N.Y. Penal Law §§ 25.00(1), 35.00, and thus if it is raised at trial the prosecution bears the burden of disproving it beyond a reasonable doubt, <u>see</u> N.Y. Penal Law § 25.00(1); <u>In the Matter of Y.K.</u>, 87 N.Y.2d 430, 433 (1996). N.Y. Penal Law § 35.15 provides that:

> A person may . . . use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself . . . from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person, unless . . .
>
> > (b) The actor was the initial aggressor; except that in such case the use of physical force is nevertheless justifiable if the actor has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened imminent use of unlawful physical force . . . .

<u>Id.</u> In other words, the statute eliminates a defendant's ability to rely on a justification defense if the jury finds that the defendant was the initial aggressor. Thus, the prosecution must prove beyond a reasonable doubt that the defendant was the initial aggressor. New York law has long recognized that proof as to whether the <u>victim</u> was the initial aggressor is relevant to this determination, <u>see</u>, <u>e.g.</u>, <u>People v. Roman</u>, 28 A.D.3d 589, 590 (2d Dep't 2006) – presumably because if it is shown that the victim was not the initial aggressor, the defendant must necessarily have been the initial aggressor.

Of particular relevance to this case, the New York Court of Appeals has held that proof of a prior threat by a victim – even if never communicated to the defendant – is relevant to the

initial aggressor determination because such a threat is "probative of the [victim's] state of mind and bears, thus, on whether the [victim] was the aggressor." People v. Miller, 39 N.Y.2d 543, 549 (1976) (citing Stokes v. People, 53 N.Y. 164, 174 (1873)).

Here, evidence of the prior threats was admitted but the trial court instructed the jury that its consideration of the prior incidents involving Torrence was limited "to making a determination as to Petty's state of mind at the moment of the shooting." (Tr. 1775). The jury was later reminded that they could use the threats to determine Petty's state of mind for the purpose of determining what Petty "reasonably believed was about to occur and was necessary in response" (Tr. 1792-93) – but was not told that they could use these threats to determine whether Torrence was the initial aggressor. The instruction was contrary to New York law, as set forth in Miller and Stokes. See Petty, 7 N.Y.3d at 285.

> b.   Analysis

As noted, the question before us is whether the "jury would have responded differently" had the correct charge been given. Blazic, 900 F.2d at 543. Obviously, this standard cannot be applied without some consideration of the level of certainty a court must have that the verdict would have been different. In Davis, the Second Circuit granted the writ where it found that there was "a substantial likelihood that a properly instructed jury would have found in the [defendant's] favor." Davis, 270 F.3d at 131. The same "substantial likelihood" standard was repeated in Jackson, 404 F.3d at 625. While not explicitly articulated as the necessary level of certainty, this Court views the "substantial likelihood" language of these opinions as an appropriate standard and thus will apply it here.

As to the nature of the court's inquiry, one district court case has distilled the learning on this question to the following two questions: "whether the affirmative defense was central to the

20

petitioner's theory at trial and whether that defense was made out by credible evidence."

Nylander v. Smith, 2010 WL 1292297, at *10 (E.D.N.Y. Mar. 30, 2010).  The consideration of

the "credible" evidence derives from the fact that both Davis and Jackson made note of what

they considered to be the "credible" evidence in each case in order to arrive at their

determination of whether there had been a due process violation.  Nylander, 2010 WL 1292297,

at *10 (quoting Davis, 270 F.3d at 131; Jackson, 404 F.3d at 625).  We too believe this is an

appropriate means of inquiry.  As there is no doubt that the justification defense was central to

Petty's defense, we thus consider next whether the credible evidence showed a substantial

likelihood that the jury's verdict would have been different had the jury been properly instructed.

        As an initial matter, it must be noted that, unlike the Davis and Jackson cases, the

justification defense was not eliminated here.  Indeed, the jury was instructed repeatedly on

justification and specifically that Petty was entitled to acquittal if the People failed to prove

beyond a reasonable doubt that Petty was the initial aggressor on July 2, 1990.  Thus, the jury

was free to use any evidence in the case – other than the prior threats – to make its determination

on this question.  The problem here was that the jury was not instructed that it could not use this

particular category of evidence – the threats prior to July 2, 1990 – for the purpose of

determining whether Petty was the initial aggressor.

        Petty argues that the jury's consideration of the threat evidence would have made it "far

more likely," Pet. Br. at 20, that the jury would have found Torrence to be the initial aggressor.

The problem with this argument is that it is not sufficient for petitioner to show that there was a

greater likelihood that the jury would have found Torrence was the initial aggressor had they

considered the threat evidence.  Rather, the question is whether the addition of that evidence

created a substantial likelihood that the jury would have found Petty not guilty.  The distinction

21

matters here because there was so little "credible" evidence to begin with, Nylander, 2010 WL 1292297, at *10-11, that would have allowed the jury to conclude that Torrence was the initial aggressor. Thus, even if the threat evidence made it "far more likely" that the jury would have found Torrence to be the initial aggressor, it does not necessarily follow there was a "substantial likelihood" that the jury would have so found.

And an examination of the credible evidence in this case shows that there is no such substantial likelihood. Boone and Dean testified that at the moment of the shooting, Torrence's back was to Petty. (Boone: Tr. 87, 100, 164-65, 182-83; Dean: Tr. 204, 295). Dean saw Torrence's head turn towards Petty, then turn away from Petty, just before the shooting. In addition, she testified that Torrence had started to walk away as he was shot. (Dean: Tr. 269, 271, 295-96). Boone said Torrence looked at Petty, looked at Boone, and then "went to run." (Boone: Tr. 87, 98, 119, 161). Petty then shot Torrence.

Both the prosecution and defense medical experts agreed that the entrance wound to Torrence's neck showed that Torrence was not facing Petty at the time of the shooting. (Feigin: Tr. 556, 574, 584-85; Taff: Tr. 1083-84). Rather, as described by the prosecution's medical expert, the back of Torrence's neck "face[d] the gun barrel" at the moment of the shooting. (Feigin: Tr. 556-57, 584-85). After Torrence was shot, he landed on his face. (Dean: Tr. 209; Boone: Tr. 87, 98, 161). Dean approached Torrence's body and did not see any weapon. (Dean: Tr. 214).

The evidence supporting Petty's initial aggressor argument consisted essentially of his own testimony. His testimony regarding when he first saw Torrence was as follows:

> [H]e wasn't moving and he had his hands at his side so when I seen him I took another step or two because I couldn't believe it was him and I had my hands at my side and when I seen him I froze an[d] I looked at him and he turned his body

> this way, (indicating) his feet were pointing towards the path but his body was
> this way (indicating).  No words where exchanged or anything like that and he
> just reached and when he reached I said, owe [sic] my God, I am going to die this
> man is gonna kill me and I looked at my waist and I pulled my weapon up and I
> fired twice at Derrick and he fell face first.

(Petty: Tr. 1205).  Petty reiterated that "I seen his body turned towards me."  (Petty: Tr. 1207).

When asked on cross-examination if Torrence was facing him, Petty replied: "Well I told you

the top torso body was twisted toward me, when I seen him I took one or two more steps to

assure it was him."  (Petty: Tr. 1322).  In other words, Petty's testimony initially was that

Torrence's "torso" was facing him at some point just prior to the shooting.  When asked directly

if Torrence's feet were pointed away from Petty and the front part of Torrence's body was

turning to look at Petty, Petty testified: "It's just like a person turn and look like I'm looking at

him."  (Petty: Tr. 1323).  When asked whether Torrence had "turn[ed] his whole body," Petty

responded "I wouldn't really know."  (Petty: Tr. 1323).

Petty then testified more unequivocally that Torrence was facing him.  (Petty: Tr. 1327)

("He was facing me; he was facing me").  When the assistant district attorney asked if Torrence

began walking away from Petty after Torrence faced him, Petty testified that he "didn't take the

time to find out what he was doing.  Once he threatened me, I reacted."  In his description of the

incident, Petty was clear that Torrence was staring at him up until the time that Petty reached for

his gun, and that all he could see was Torrence "reach[ing]" and he "just reacted."  (Petty: Tr.

1206-07).[2]

---

[2] The testimony was as follows:

Q.    You indicated the first time you saw Derrick [Torrence] what was he
doing if anything?

A.    The first time I saw Derrick he was standing still staring at me.

23

Petty testified that he saw Torrence reach into his waistband with his right hand, though he did not see a weapon.  (See Petty: Tr. 1325-26).  Petty stated that Torrence "threatened his life" by virtue of the fact that he reached for his waist."  (Petty: Tr. 1325-26).[3]  Petty later testified that at the moment Torrence reached for his waist, Petty could "see [Torrence's] torso, the upper part of his body completely turned around facing [Petty] and [Petty] could see both his hands."  (Petty: Tr. 1351).  The cross-examination concluded as follows:

> Q.     [Torrence is] facing you and you pull out the gun, you don't know whether or not you release the safety, you don't know whether or not you cock it although you are familiar with 38's, you point it up, 40 feet away, and you just happen to hit him in the back of the neck, right? And he is facing you?
>
> A.     Sure.

(Petty: Tr. 1353).

Considering all of the testimony in the case, the credible evidence that Torrence was the initial aggressor was so weak as to be almost non-existent.  Petty's story that Torrence was facing him at the time Petty shot him was critical to Petty's explanation that Torrence's alleged reaching for his waist constituted a threat to Petty.  But Petty's story cannot be reconciled with the uncontroverted medical evidence that only the back of Torrence's neck was facing Petty at the time of the shooting.  It also cannot be squared with the evidence of the two witnesses, who

---

> Q.     And at that moment did he ever stop staring at you?
>
> A.     No, all he did was he reached and that's all I could see, I just reacted.

(Petty: Tr. 1206-07).

[3]  Torrence's father testified that Torrence was left-handed, rarely used his right hand, and even owned a pair of left-handed scissors, photographs of which were admitted into evidence.  (Peeples: Tr. 1482-83, 1492-95, 1499-1500).

made clear that Torrence was walking or running away from Petty at the time of the shooting and that Torrence's back was to Petty.  (Boone: Tr. 87, 100, 164-65, 182-83; Dean: Tr. 204).

In light of this weak evidence, the jury's consideration of evidence that Torrence had made threats against Petty in the past undoubtedly would have improved the quality of evidence favoring Petty's claim that Torrence was the initial aggressor.  After all, the previous threats could be viewed as making it more likely that Torrence harbored an intention to harm Petty, and such an intention would support the notion that on the night of the shooting, Torrence acted on that intention.  But the question to be answered here is not whether the quality of evidence favoring Petty would have been improved by the jury's consideration of the threat evidence. Rather, the question is whether there was a "substantial likelihood" that the  jury "would have" found that Torrence was the initial aggressor had it considered that evidence.

In other words, we must decide whether the addition of the threat evidence would have made the already extremely weak evidence on the initial aggressor question sufficiently strong that there was a substantial likelihood that it would have resulted in the jury's conclusion that Torrence was the initial aggressor.  But in light of the weak evidence favoring Petty's story, we cannot say that the inclusion of the prior threat evidence would be enough to create a substantial likelihood that a jury would conclude that Torrence was, in the words of the jury charge, "using or about to use deadly physical force against" Petty.

Accordingly, we conclude that the improper jury instruction did not "so infect[] the entire trial that the resulting conviction violates due process."  Cupp, 414 U.S. at 146.  Even if we had any doubt on this score, we could not conclude that the resolution of the question in favor of the prosecution is "so lacking in justification" that it constitutes "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington,

25

131 S. Ct. at 786-87.

In light of this conclusion, it is unnecessary to conduct a harmless error analysis under

Brecht.

B.      Petty's Right to Call Scott as a Witness

Petty also claims that the trial court's decision to preclude Scott's testimony violated his

constitutional right to present a defense.  See Pet. Br. at 32-37.  The Second Circuit has

summarized the law on the right of a criminal defendant to call witnesses as follows:

> "In all criminal prosecutions, the accused shall enjoy the right . . . to have
> compulsory process for obtaining witnesses in his favor . . . ."  U.S. Const.
> amend. VI.  "The right to call witnesses in order to present a meaningful
> defense at a criminal trial is a fundamental constitutional right secured by
> both the Compulsory Process Clause of the Sixth Amendment and the Due
> Process Clause of the Fourteenth Amendment."  Washington v. Schriver,
> 255 F.3d 45, 56 (2d Cir. 2001) (citing Supreme Court cases).  "Few rights
> are more fundamental than that of an accused to present witnesses in his
> own defense."  Taylor v. Illinois, 484 U.S. 400, 408 (1987).  This right
> protects, among other things, the truth-finding process.  "The ends of
> criminal justice would be defeated if judgment were to be founded on a
> partial or speculative presentation of the facts."  Id. at 409 (quoting United
> States v. Nixon, 418 U.S. 683, 709 (1974)).  To those ends, "[t]he rights to
> confront and cross-examine witnesses and to call witnesses in one's own
> behalf has long been recognized as essential to due process."  [Chambers
> v. Mississippi, 410 U.S. 284, 294 (1973)].
>
> However, "[t]he accused does not have an unfettered right to offer
> testimony that is incompetent, privileged, or otherwise inadmissible . . ."
> Taylor, 484 U.S. at [410].  A trial court may consider the "the broader
> public interest in a full and truthful disclosure of critical facts."  See id. at
> 412.  Restrictions on a defendant's right under the Sixth Amendment to
> introduce testimony on his behalf, however, "may not be arbitrary or
> disproportionate to the purposes they are designed to serve."  Rock v.
> Arkansas, 483 U.S. 44, 55-56 (1987).
>
> To establish a Sixth Amendment violation, a defendant must
> demonstrate that he was deprived of the opportunity to present a witness
> who would have provided testimony that was "both material and favorable
> to his defense."  United States v. Valenzuela-Bernal, 458 U.S. 858, 867

26

(1982).  Materiality requires that "the omission . . . be evaluated in the context of the entire record."  Id. at 868.

Howard v. Walker, 406 F.3d 114, 131-32 (2d Cir. 2005).

The Supreme Court has similarly made clear that the right to present evidence is subject to "reasonable restrictions" by the trial court.  United States v. Scheffer, 523 U.S. 303, 308 (1998).  Thus, a trial court "may refuse to allow cumulative, repetitive, or irrelevant testimony." Geders v. United States, 425 U.S. 80, 87 (1976); accord Holmes v. South Carolina, 547 U.S. 319, 326 (2006) (Sixth Amendment permits exclusion of "repetitive" evidence); Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (same); United States v. Taylor, 562 F.2d 1345, 1363 (2d Cir.) ("[i]t is not improper to deny a request for a subpoena where the testimony of the witness would be only cumulative"), cert. denied, 432 U.S. 909 (1977); United States v. Rosa, 493 F.2d 1191, 1194 (2d Cir.), cert. denied, 419 U.S. 850 (1974).[4]

Petitioner argues that Scott's testimony "went to the heart of the defense" because it "supported the defense's theory that Torrence acted upon his stated intent to kill petitioner."  Pet. Br. at 33.  But the evidence supporting this theory was not excluded.  Indeed, Petty offered evidence through four witnesses, including himself, of the multiple threats Torrence had made to kill Petty on two separate dates shortly before the homicide.  Thus, Petty had ample opportunity to argue that Torrence's intention was to kill him and, indeed, his attorney did so at great length in summation.  (Tr. 1658-69, 1670-72, 1675-77, 1678-80).  Thus, Scott's testimony was not so material in light of the other evidence admitted that its exclusion amounted to a constitutional

_____

[4] If a constitutional violation is found, and the state court's decision concluding otherwise constituted "an unreasonable application of[] clearly established Federal law" under 28 U.S.C. § 2254(d)(1), a court next "turns to the question of whether [the] error[] [was] harmless." Howard, 406 F.3d at 133.

violation.

<u>Conclusion</u>

For the foregoing reasons, the petition for writ of habeas corpus should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. <u>See also</u> Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. William H. Pauley, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Pauley. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.</u>, 596 F.3d 84, 92 (2d Cir. 2010).

Dated: March 22, 2011
          New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Natalie Bocca Rea
The Legal Aid Society
199 Water Street
New York, NY 10038

Dana Levin
Nancy D. Killian
District Attorney's Office
Bronx County
198 East 161st Street
Bronx, NY 10451

violation.

Conclusion

 For the foregoing reasons, the petition for writ of habeas corpus should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

 Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. William H. Pauley, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Pauley. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: March 22, 2011
   New York, New York

              GABRIEL W. GORENSTEIN
              United States Magistrate Judge

Copies sent to:

Natalie Bocca Rea
The Legal Aid Society
199 Water Street
New York, NY 10038